# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA
        Plaintiff,

v.                               Case No. 05-CR-245

MICHAEL MAAS
        Defendant.

## FINDINGS OF FACT AND VERDICT

Defendant Michael Maas was charged with disposing of a firearm, to wit, a Winchester Super X2 12-gauge shotgun bearing serial number 11AMY03912 ("the Super X2"), to his brother Scott Maas ("Scott"), a convicted felon, on or about July 26, 2002, contrary to 18 U.S.C. § 922(d). Defendant waived his right to trial by jury, and the government consented to a court trial. See Fed. R. Crim. P. 23. Defendant requested that I make findings of fact under Fed. R. Crim. P. 23(c). Those findings and my verdict follow.

## I. ELEMENTS OF THE OFFENSE

Section 922(d) provides, in pertinent part:

It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person–

(1)     is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[.]

18 U.S.C. § 922(d).

The elements of the offense are: (1) that the defendant knowingly disposed of a firearm; (2) that the individual to whom the firearm was transferred was a convicted felon;

and (3) that the defendant knew or had reasonable cause to believe that the individual had a prior felony conviction. United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005); United States v. Fifty-Two Firearms, 362 F. Supp. 2d 1308, 1313 (M.D. Fla. 2005), adopted by, 362 F. Supp. 2d 1323 (M.D. Fla. 2005); see also NINTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS - CRIMINAL § 8.55 (2003) (stating that the elements are (1) the defendant wilfully disposed of a firearm to a convicted felon and (2) the defendant knew or had reasonable cause to believe that the individual was a convicted felon).[1]

A person acts "knowingly" if he realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case. SEVENTH CIRCUIT FEDERAL JURY INSTRUCTIONS - CRIMINAL 4.06 (1999). To "dispose of" a firearm means "to transfer a firearm so that the transferee acquires possession of the firearm." United States v. Jefferson, 334 F.3d 670, 675 (7th Cir. 2003). The disposal can be gratuitous and/or temporary, so long as possession is transferred. Id. "Possession" of an object is the ability to control it. Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction or control over it, either directly or through others. SEVENTH CIRCUIT FEDERAL JURY INSTRUCTIONS - CRIMINAL 235 (1999). To have "reasonable cause to believe" that someone is a convicted felon means to have knowledge of facts which, although not amounting to direct knowledge, would cause a reasonable person,

---

[1] The Seventh Circuit has no pattern instruction for § 922(d) offenses.

knowing the same things, to reasonably conclude that the other person was in fact a convicted felon. Fifty-Two Firearms, 362 F. Supp. 2d at 1313.

In the present case, the parties stipulated that Scott Maas was a convicted felon and that the firearm traveled in interstate commerce prior to July 26, 2002.[2] Therefore, the only issues were (1) whether defendant disposed of the firearm to Scott, and (2) whether defendant knew or had reasonable cause to believe that Scott was a convicted felon.

## II. FINDINGS OF FACT

On October 4, 2002, defendant purchased the Super X2 and a Benelli model SBE 12-gauge shotgun at Gander Mountain. Although he certified that he was the actual buyer of the firearms and was not acquiring them on behalf of another person, he actually bought the Super X2 for Scott. (See Govt. Ex. 2.) Shortly thereafter, defendant gave the Super X2 to Scott, and Scott took the Super X2 on a hunting trip with defendant, Cory Bledsoe and Christopher Salzer to North Dakota in March 2003. During that trip, defendant and Scott shot three birds out of season. They then transported the birds to Wisconsin and gave them to a taxidermist. A state game warden saw the birds at the taxidermy shop, learned that they were brought in by the Maas brothers, and launched an investigation.

Fish and Wildlife Service Special Agent Gary Jagodzinski was called upon to assist in the investigation, which led to the January 2005 execution of a search warrant at the

---

[2] It appears that under § 922(d) the government need not prove that the gun traveled in interstate commerce, as it must in felon-in-possession cases. See United States v. Green, 471 F.2d 775, 777 (7th Cir. 1972); United States v. Taylor, 897 F. Supp. 1500, 1506 (D. Conn. 1995); see also Peters, 403 F.3d at 1277; United States v. Monteleone, 77 F.3d 1086, 1091-92 (8th Cir. 1996). Nevertheless, if such proof is required, the parties agreed that the shotgun at issue was manufactured in Connecticut and therefore traveled in interstate commerce.

3

home of defendant's parents, where defendant was staying after a fire destroyed his house in June 2004. About twelve firearms were found in the home, some defendant's, but the Super X2 was not among them. Jagodzinski interviewed defendant about the birds, and defendant falsely stated that he shot them in Green Bay in the fall of 2003, which would have been legal. Jagodzinski confronted defendant with the results of a forensics analysis of the birds, which revealed that this was not possible, and he told defendant that it was important to tell the truth. Defendant then admitted that he shot one of the birds in North Dakota, and someone else shot the other two. Jagodzinski said that the other person must have been Scott. Defendant replied that Jagodzinski would have to talk to Scott about it.[3]

Jagodzinski then interviewed Scott at Scott's residence in January 2005. Jagodzinski asked to see his (Scott's) guns, and Scott responded by getting a key chain, opening a gun safe, and retrieving two firearms – the Super X2 and a Remington 308 rifle. Based on Scott's status as a convicted felon, Jagodzinski seized the weapons. (See Govt. Ex. 3.)

A state game warden also interviewed Salzer about the hunting trip in January 2005 and advised Salzer that Scott was a felon. Salzer, upset that he had been hunting with a felon, called defendant the next day and asked how Scott got a gun. Defendant responded that he bought the Super X2 for Scott. Defendant further stated that he and his brother bought two guns together at Gander Mountain and used them in North Dakota.

---

[3] Defendant pleaded guilty to transporting in interstate commerce wildlife taken in violation of state law contrary to 18 U.S.C. § 3372 & 3373 prior to the commencement of this trial.

4

Meanwhile, Jagodzinski enlisted the Bureau of Alcohol, Tobacco and Firearms ("ATF") to run a trace on the Super X2, which revealed that defendant was the recorded purchaser. Jagodzinksi, accompanied by ATF Special Agent Sandra DeValkenaere, re-interviewed defendant at defendant's home on April 27, 2005. Defendant admitted that he bought the Super X2 and stated that he gave it to Scott for safekeeping after his (defendant's) house burned down in 2004. Jagodzinski asked how, if this was so, Scott came to have the shotgun during the hunting trip to North Dakota in 2003. Defendant admitted that Scott had the gun on that trip but stated that it malfunctioned, and Scott used a different gun to hunt. Defendant further stated that he trusted his brother and knew he would not do anything wrong with the shotgun. Jagodzinski asked defendant why he would give a gun to his brother knowing his brother was a felon. Defendant stated that his brother was young, drunk and stupid at the time of the incident – attempted theft of a snowmobile – that led to his felony conviction. Agent DeValkenaere confirmed that defendant made these statements. Defendant did not advise the agents that he believed Scott's felony was a juvenile matter that did not "count" for purposes of the ban on weapon possession.

Based on this evidence, I find as follows.

First, defendant knowingly "disposed of" the Super X2 to Scott. Defendant bought the gun for Scott and gave it to him prior to and for the March 2003 hunting trip. While there was no direct evidence of precisely when the transfer occurred, the circumstantial evidence demonstrated beyond a reasonable doubt that it occurred. See United States v. Ortiz, 318 F.3d 1030, 1038 (8th Cir. 2003) (affirming conviction of making straw purchase of firearm based on circumstantial evidence); United States v. Lehmann, 613

5

F.2d 130, 133 (5th Cir. 1980) (citing <u>United States v. Little</u>, 562 F.2d 578 (8th Cir. 1977) (affirming interstate transport of firearm conviction based on circumstantial evidence that defendant acquired gun in one state and was found with it in another). This evidence included defendant's statements to the agents and to Salzer, the ATF records of the purchase, and the recovery of the Super X2 at Scott's house from a safe to which Scott had a key. Scott obtained possession of the weapon prior to, during and after the hunting trip.[4]

Second, defendant knew or had reasonable cause to believe that Scott was a felon. Defendant admitted to agents Jagodzinski and DeValkenaere that he knew Scott was a felon. At trial, defendant testified that he believed the felony conviction was a juvenile matter, which did not bar Scott from possessing firearms. However, he did not advise the agents of this belief and presented it for the first time at trial. Further, the evidence showed that defendant and Scott were close, saw each other regularly, and defendant was aware of Scott's state of affairs. For instance, defendant admitted that he knew Scott's probation

---

[4] Although I find that defendant gave Scott the Super X2 prior to the 2003 hunting trip, I also note that defendant disposed of the weapon to Scott even under his version of events. At trial, defendant testified that after his house burned down in 2004, he placed the Super X2 in a safe and gave the safe to Scott for safekeeping. He testified that he locked the safe and kept the key. Although defendant claimed that he did not directly hand the gun to Scott, he admitted that he placed the safe containing the gun in Scott's house around June 2004, and it was undisputed that Scott still had the safe in January 2005. Defendant also admitted that he knew Scott acquired a key to the safe. To dispose of a firearm means to transfer it so that the transferee acquires possession. Possession of an object means the ability to control it, and may be exercised even without direct physical contact with the object. Clearly, Scott had control over the gun prior to and at the time Agent Jagodzinski came to his house. Further, the claim that defendant gave the gun to Scott for safe-keeping does not alter the analysis. In <u>Jefferson</u>, the court found that the defendant disposed of a firearm when he gave it to his brother to place in a safe while the defendant was out of town. 334 F.3d at 672.

on the snowmobile case had been revoked, and that Scott was sentenced to custody in an adult institution. These circumstances provide further support for the proposition that defendant has reason to know Scott's age and criminal contacts.[5]

For several reasons, in addition to my observation of his demeanor, I find defendant's testimony on these two issues not credible. First, his story as to how the firearm was transferred changed. He initially told the agents that he gave the Super X2 to Scott for safe-keeping, but then admitted that he gave the weapon to Scott for the North Dakota trip. At trial, defendant testified that the agents were lying about the latter statement, but I found their testimony straightforward and credible. There is no evidence

---

[5]Although I find that defendant knew or had reason to believe Scott was a felon, I also note that his defense likely fails even on its own terms. Defendant claimed that he believed an offense committed by a 17-year-old was a juvenile matter, which did not bar possession of firearms. Under 18 U.S.C. § 921(a)(20), whether an offense constitutes a "crime punishable by imprisonment for a term exceeding one year" is "determined in accordance with the law of the jurisdiction in which the proceedings were held." See also United States v. Walters, 359 F.3d 340, 344 (4th Cir. 2004) (stating that § 921(a)(20) incorporates state law). Under applicable Wisconsin law, a person is considered an "adult" for purposes of criminal penalties at the age of 17. See, e.g., State v. Williams, 236 Wis. 2d 293, 307-08 (2000). Moreover, under applicable Wisconsin law, a juvenile adjudication "for an act committed on or after April 21, 1994, that if committed by an adult in this state would be a felony," also bars the person from possessing a firearm. Wis. Stat. § 941.29(1)(bm). Thus, a 17-year-old is subject to adult criminal penalties in Wisconsin, and even if Scott had been a juvenile, his adjudication of a "juvenile felony" would have barred his possession of a gun. Cf. Waters, 359 F.3d at 344 (holding that, under Virginia law, a juvenile adjudication did not qualify under § 921(a)(20) because state law did not permanently disqualify such delinquents from firearm possession). Finally, the element of the offense under § 922(d) is knowledge or reason to believe that the transferee is a felon. It is not necessary for the government to also prove the defendant's knowledge of the disabilities that flow from the transferee's status as a felon. Cf. United States v. Griffin, 389 F.3d 1100, 1104 (10th Cir. 2004), cert. denied, 543 U.S. 1192 (2005) ("Conviction under § 922(g)(1) therefore does not require proof that a defendant knew that he was prohibited from possessing a firearm."). Consistent with § 922(g), I see no reason why § 922(d) imposes any requirement of knowledge that the person to whom the gun was transferred was barred from possessing firearms.

7

of any motive to fabricate on their part. Second, it makes little sense, under defendant's version, that he would give one gun – the Super X2 – to Scott for safekeeping after the fire yet take several other guns with him to his parents' house. Third, defendant admittedly never told the agents that he believed Scott's felony was a juvenile matter; he first raised that issue at trial. Fourth, defendant admittedly lied to Jagodzinski about how he shot the birds during the initial interview in January 2005 and also refused to disclose Scott's role in the shooting. Finally, defendant's credibility was undermined by Salzer's testimony that defendant invited Salzer to hunt with defendant and Scott in the fall of 2005, after defendant clearly knew – he was advised by agent Jagodzinski – that Scott could not have a gun. This invitation supports the inference I draw from defendant's statement to the agents about Scott's felony – Scott was young, drunk and stupid – that defendant did not consider the felony a big deal and was willing to give Scott a gun anyway.[6]

Defendant presented testimony from hunting companions Cory Bledsoe and Brian Arneson, who said that they did not know Scott was a felon.[7] However, the issue was defendant's knowledge, and defendant admitted that he knew Scott was a felon. These witnesses also testified that Scott may have used a different Super X2, which he bought

---

[6]Based on his demeanor, I found Salzer's testimony credible. Further, as a hunting companion and co-worker of defendant's at the Wisconsin Department of Corrections, I saw no reason why he would fabricate defendant's statements.

[7]The government rebutted this evidence with testimony from Nathan Mecklenburg, another hunting companion, who testified that he knew Scott was a felon, and that Scott talked about his status with the hunting group. Defendant's wife also testified that she did not know Scott was a felon. However, as discussed above, the issue was defendant's knowledge.

8

himself, in 2003. However, Bledsoe offered no specifics on where Scott got the gun, and Arneson was not present in North Dakota to see which gun Scott used there.

Defendant also presented evidence that it was easy to make a private firearm purchase, without a background check, where he and Scott lived. However, it was undisputed that defendant bought the Super X2 at issue at Gander Mountain in October 2002, and that Scott possessed that very same gun in January 2005.

Finally, defendant presented evidence that while hunting he and Scott were stopped by DNR agents who checked their licenses, and Scott was allowed to continue to hunt. However, there was no evidence that DNR agents run hunters' criminal records during these inspections, or that a felon cannot get a hunting license in Wisconsin. The parties stipulated that Scott was a felon, and it was undisputed that he hunted thereafter. Indeed, defendant invited Salzer to hunt with Scott and himself in the fall of 2005, well after defendant knew he was under investigation for giving a gun to his brother, a felon.

Therefore, I find that the government has proven all of the elements of the offense beyond a reasonable doubt.

### III. RULE 29 MOTION

On May 7, 2006, defendant filed a motion for acquittal under Fed. R. Crim. P. 29. In ruling on such a motion, the court must decide whether, at the time of the motion, there was relevant evidence from which the fact-finder could reasonably find the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. United States v. Reed, 875 F.2d 107, 111 (7th Cir. 1989).

9

At the time the motion was filed, the government was in the middle of its rebuttal case.[8] The evidence of record at that time was sufficient. Indeed, the evidence was sufficient at the close of the government's case-in-chief. Specifically, defendant's admissions to agents Jagodzinski and DeValkenaere, coupled with the ATF records and the recovery of the gun from Scott's house, provided sufficient evidence to support guilt beyond a reasonable doubt.

In his motion, defendant notes that the indictment alleges that the offense was committed in Wisconsin on or about July 26, 2002, but the evidence showed that the offense was committed either in North Dakota in 2003 or Wisconsin in 2004. Therefore, defendant questions if the court has jurisdiction.

The court has jurisdiction over the subject matter of this "prosecution pursuant to 18 U.S.C. § 3231, which confers jurisdiction 'of all offenses against the laws of the United States.'" United States v. Ceballos, 302 F.3d 679, 691 (7th Cir. 2002). What defendant really seems to be complaining about is venue.[9] Unless a particular statute fixes venue specifically, venue is generally proper in any district in which the offense was begun, continued or completed. United States v. Sidener, 876 F.2d 1334, 1337 (7th Cir. 1989). Further, because venue is not an element of the offense, the government has the burden

---

[8]The parties submitted their cases-in-chief on May 3, 2006, and I adjourned the proceedings to May 8 and later May 16 to allow the government to obtain the presence of additional rebuttal witnesses. I took the Rule 29 motion under advisement at the May 8 proceeding.

[9]If the claimed lack of venue is apparent on the face of the indictment, an objection must be lodged before the close of the government's case. United States v. John, 518 F.2d 705, 708-9 (7th Cir. 1975). If it is not obvious from the indictment, then it can be raised as a motion for acquittal. Id. at 709.

10

of proving it only by a preponderance of the evidence. See United States v. Brandon, 50 F.3d 464, 469 (7th Cir. 1995).

The government proved by a preponderance of the evidence that defendant purchased the gun and provided it to defendant in Wisconsin prior to the March 2003 hunting trip. The evidence further suggested that they traveled from Wisconsin to North Dakota (and thus transported the weapon) together. These are reasonable inferences to be drawn from defendant's statements to the agents and the surrounding circumstances. See United States v. Bishop, No. 00 Crim. 312, 2002 U.S. Dist. LEXIS 4369, at *11-12 (S.D.N.Y. Mar. 15, 2002) (finding that circumstantial evidence was sufficient to show by a preponderance of the evidence that acts in furtherance of firearms offenses were committed in the district).

There is perhaps a suggestion in the motion that the government's proof as to the date of the offense varied from the indictment. However, by not clearly raising the issue of constructive amendment, defendant has waived the issue. Even if not waived, the argument would fail.

As noted, the indictment alleged that the offense occurred on or about July 26, 2002, while the evidence showed that defendant purchased the Super X2 on October 4, 2002 (Govt. Ex. 2) and provided it to Scott prior to the North Dakota hunting trip in March 2003. Thus, the offense did not occur in July 2002.

However, under the circumstances of this case, the variance is immaterial. Charging that an act occurred on one date and proving that it occurred at a different time does not ordinarily constitute an impermissible constructive amendment of the indictment; rather, it "is a classic variance, which does not change the nature of the crime alleged."

11

United States v. Krilich, 159 F.3d 1020, 1027 (7th Cir. 1998). "Indeed, unless the particular date is an element of the alleged offense, it is generally sufficient to prove that the offense was committed on any day before the indictment and within the statute of limitations." United States v. Synowiec, 333 F.3d 786, 791 (7th Cir. 2003) (internal quote marks omitted).

A particular date is not an element of the offense under § 922(d). Moreover, the indictment in the present case alleged that the offense occurred "on or about July 26, 2002." The Seventh Circuit has stated that:

> Where the indictment alleges that an offense allegedly occurred "on or about" a certain date, the defendant is deemed to be on notice that the charge is not limited to a specific date. He therefore cannot make the requisite showing of prejudice based simply on the fact that the government has failed to prove a specific date. . . . The courts agree that when the indictment uses the "on or about" designation, proof of a date reasonably near to the specified date is sufficient. . . .
>
> United States v. Leibowitz, 857 F.2d 373, 379 (7th Cir. 1988) (citations omitted). Indeed, "unless the particular date is an element of the alleged offense, it is generally sufficient to prove that the offense was committed on any day before the indictment and within the statute of limitations." Id. at 378.

United States v. Folks, 236 F.3d 384, 391 (7th Cir. 2001).

In the present case, defendant disposed of the weapon to Scott between October 4, 2002 and March 2003. These dates are well-within the statute of limitations. Further, they constitute but a slight variance from the date alleged in the indictment. Finally, defendant alleges no prejudice based on the discrepancy. For instance, he does not argue that his ability to mount a defense was compromised or that he suffered any surprise based on the proof at trial.

12

It is true that in United States v. Ross, 412 F.3d 771, 774-75 (7th Cir. 2005), the Seventh Circuit recently reversed a conviction based on a discrepancy between the date alleged in the indictment and the proof/jury instructions, even though such period was within the statute limitations. However, in that case, the discrepancy – four years – was much greater than in the present case. Further, in Ross the defendant was severely prejudiced by the variance because the proof presented at trial cast serious doubt on his possession of the gun on the date alleged in the indictment, but the court's instruction eased the government's burden by allowing the jury to convict based on possession years earlier. The court concluded: "Had the instructions limited the jury's consideration to the later incident, Ross might well have been acquitted." Id. at 775. In the present case, there is no similar prejudice. Defendant "was not misled and could prepare his defense for any date after that alleged in the indictment until the date of the indictment." United States v. Bruckman, 466 F.2d 754, 758 (7th Cir. 1972) (collecting cases approving six month and two month variances).[10] Therefore, there was no constructive amendment.

---

[10]Ross cited United States v. Hinton, 222 F.3d 664, 673 (9th Cir. 2000), which in turn listed cases involving two year and seven month discrepancies as illustrations of prejudicial variances. The cases cited in Hinton are distinguishable. In United States v. Tsinhnahijinnie, 112 F.3d 988, 991 (9th Cir. 1997), an Indian prosecution, the defendant was prejudiced by the variance because he presented evidence that he not on the Reservation on the date of offense charged in the indictment. His defense was defeated when the court allowed the government to broaden the time period beyond his "alibi." United States v. Casterline, 103 F.3d 76 (9th Cir. 1996) did not find a fatal variance but rather reversed based on insufficiency of the evidence. In that case, the indictment alleged that the defendant possessed "two derringers 'on or before' November 14." Id. at 78. It did not use the more common "on or about" language used in the instant indictment. Further, it was undisputed that Casterline was in prison on November 14 and had been for seven months, and that the guns were on November 14 in the possession of law enforcement. The government argued that Casterline nevertheless possessed them at that time because he had an ownership interest. The court disagreed, stating that in order to have possession "Casterline had to have 'physical control' or 'the power and intent to

13

## IV.  VERDICT

Therefore, the court finds defendant Michael Maas guilty of the offense charged in count two of the indictment, contrary to 18 U.S.C. § 922(d)(1).

Dated at Milwaukee, Wisconsin, this 24th day of May, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

control' the derringers.  But with Casterline locked up by the state, and guns by the sheriff, no reasonable jury could so conclude."  Id. at 79.

Case 2:05-cr-00245-LA   Filed 05/25/06   Page 14 of 14   Document 41