# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

  v.                                  Case No. 05-CR-245

**MICHAEL MAAS**
        **Defendant.**

## SENTENCING MEMORANDUM

The government charged defendant Michael Maas with transferring a firearm to a felon, 18 U.S.C. § 922(d)(1), and transporting in interstate commerce wildlife taken in violation of state law, 16 U.S.C. §§ 3372 & 3373. He pleaded guilty to the wildlife count but went to trial on the firearm count. I found him guilty following a court trial.

The probation office prepared a pre-sentence report ("PSR"), which calculated his base offense level on the firearm count as 14, U.S.S.G. § 2K2.1(a)(6)(B), then applied a 2 level enhancement under § 3C1.1 because defendant perjured himself at trial, for an adjusted level of 16. The PSR determined that the base level on the wildlife count was 6 under § 2Q2.1, which had no effect on the final level after application of the multi-count adjustment under § 3D1.4. Coupled with a criminal history category of I, the imprisonment range was 21-27 months under the advisory sentencing guidelines.

Defendant objected to several guideline determinations in the PSR and moved for a departure under § 5H1.6. In this memorandum, I address his contentions and set forth the basis for the sentence imposed.

## I. FACTS[1]

On October 4, 2002, defendant purchased a Super X2 12-gauge shotgun at Gander Mountain. Although he certified that he was not acquiring it on behalf of another person, he actually bought the shotgun for his brother Scott because, as a convicted felon, Scott could not purchase it himself. Shortly thereafter, defendant gave the shotgun to Scott,[2] and Scott took it on a hunting trip with defendant, Christopher Salzer and Cory Bledsoe to North Dakota in March 2003. During that trip, defendant and Scott accidentally shot three birds out of season.[3] Even after realizing their mistake, they transported the birds to Wisconsin and brought them to a taxidermist. A state game warden saw the birds at the taxidermy shop, learned that the Maas brothers had brought them in, and launched an investigation.

Fish and Wildlife Service Special Agent Gary Jagodzinski interviewed defendant about the birds in January 2005, and defendant falsely stated that he shot them in Green Bay in the fall of 2003, which would have been legal. Jagodzinski confronted defendant with the results of a forensics analysis of the birds, which revealed that this was not possible, and told defendant that it was important to tell the truth. Defendant then admitted that he shot one of the birds in North Dakota, and someone else shot the other two.

---

[1] I draw these facts primarily from the trial testimony and my written findings of fact, supplemented by the PSR.

[2] The government charged Scott with being a felon in possession of a firearm. 18 U.S.C. § 922(g). He pleaded guilty, and I sentenced him to nine months in prison.

[3] Scott did not use the Super X2 shotgun to kill these birds.

2

Jagodzinski said that the other person must have been Scott. Defendant replied that Jagodzinski would have to talk to Scott about it.

Jagodzinski then interviewed Scott and asked to see his (Scott's) guns. Scott responded by getting a key chain, opening a gun safe, and retrieving the Super X2 shotgun, as well as another rifle. Based on Scott's status as a convicted felon, Jagodzinski seized the weapons. Scott indicated that defendant purchased the weapon for him because he could not do so himself.

A state game warden also interviewed Salzer about the hunting trip and advised Salzer that Scott was a felon. Salzer, upset that he had been hunting with a felon, called defendant the next day and asked how Scott got a gun. Defendant responded that he bought the Super X2 for Scott.

Jagodzinski enlisted the Bureau of Alcohol, Tobacco and Firearms ("ATF") to run a trace on the Super X2 shotgun, which revealed that defendant was the recorded purchaser. Jagodzinksi, accompanied by ATF Special Agent Sandra DeValkenaere, re-interviewed defendant at defendant's home on April 27, 2005. Defendant admitted that he bought the Super X2 and stated that he gave it to Scott for safekeeping after his (defendant's) house burned down in 2004. Jagodzinski asked how, if this was so, Scott came to have the shotgun during the hunting trip to North Dakota in 2003. Defendant admitted that Scott had the gun on that trip but stated that it malfunctioned, and Scott used a different gun to hunt. Defendant further stated that he trusted his brother and knew he would not do anything wrong with the shotgun. Jagodzinski also asked defendant why he would give a gun to his brother knowing his brother was a felon. Defendant stated that his

3

brother was young, drunk and stupid at the time of the incident – attempted theft of a snowmobile – that led to his felony conviction.

At trial, defendant denied telling the agents that he gave the gun to Scott for the March 2003 hunting trip, but I found his testimony incredible. Defendant also testified that he believed Scott's felony conviction was a juvenile matter that did not "count" for purposes of the ban on weapon possession.[4] However, I also found this claim, which defendant did not share with the agents during the April 2005 interview, incredible. Further, the claim was rebutted by the fact that defendant, who had a juvenile felony adjudication himself, petitioned the state court to re-instate his right to possess firearms.

As noted, I found defendant guilty, ordered a PSR and set the case for sentencing.

## II. DISCUSSION

In imposing sentence, I follow a three-step procedure. First, I determine the advisory guideline range, resolving any objections necessary to that determination. Second, I decide whether to grant any departures from the range under the Sentencing Commission's policy statements. Third, I determine the appropriate sentence under the factors set forth in 18 U.S.C. § 3553(a). See, e.g., United States v. Peralta-Espinoza, 413 F. Supp. 2d 972, 974 (E.D. Wis. 2006).

**A.    Guideline Range**

    **1.    Offense Level on the Firearm Count**

Defendant argued that the offense level on the firearm count should be 6 under § 2K2.1(b)(2) rather than 14 under § 2K2.1(a)(6)(B). The latter provision provides for an

---

[4]The parties stipulated that Scott had an adult felony conviction.

4

offense level of 14 if the defendant was convicted under 18 U.S.C. § 922(d), which defendant was in the present case. U.S.S.G. § 2K2.1(a)(6)(B). However, § 2K2.1(b)(2) provides that if the defendant, other than a defendant subject to subsection (a)(1), (a)(2), (a)(3), (a)(4), or (a)(5),[5] "possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition," the level is decreased to 6. U.S.S.G. § 2K2.1(b)(2). Application note 7 explains that:

> Under subsection (b)(2), "lawful sporting purposes or collection" as determined by the surrounding circumstances, provides for a reduction to an offense level of 6. Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law.

U.S.S.G. § 2K2.1 cmt. n.7.

In Scott's case, I applied § 2K2.1(b)(2) because he possessed the shotgun at issue solely for lawful hunting purposes. United States v. Maas, 428 F. Supp. 2d 888, 889-90 (E.D. Wis. 2006). Defendant argued that it would be absurd to give Scott – the convicted felon – the lower level, but not him. The government countered that the guidelines apply to offenses, not cases, and that defendant's conviction of disposing of the firearm, rather than possessing it (as Scott did), rendered § 2K2.1(b)(2) inapplicable.

The government found some support for its position in United States v. Miller, 224 F.3d 247 (3d Cir. 2000). In that case, the majority held that § 2K2.1(b)(2) did not apply

---

[5]Sections (a)(1)-(5) apply if the defendant has previously been convicted of a crime of violence or controlled substance offense, or the firearm in question was otherwise illegal (e.g., an assault rifle or sawed-off shotgun).

5

when the defendant sold two handguns to an undercover officer and was subsequently convicted of selling firearms without a license under 18 U.S.C. § 922(a)(1)(A). The defendant argued that <u>prior</u> to the sale he possessed the guns for lawful sporting purposes, and that the sale should not disqualify him from the reduction to level 6. The court disagreed, reasoning that because he sold the firearms he did not possess them <u>solely</u> for sporting purposes.[6] <u>Id.</u> at 255.

Perhaps because <u>Miller</u> involved a purely commercial transfer, and the evidence did not disclose what the defendant thought his purchaser planned to do with the guns, the court did not consider caselaw indicating that a defendant can obtain the reduction based on the nature of <u>another's</u> possession of the firearm at issue. In <u>United States v. Mojica</u>, 214 F.3d 1169 (10th Cir. 2000), the court held that the defendant's lawful sporting purpose could be derivative of another's purpose. There, the defendant possessed a hunting shotgun which his brother, with whom he lived, had borrowed. <u>Id.</u> at 1170. The court noted that application note 7 does not require the defendant to transport or possess the firearm for his <u>own</u> sporting purposes. Instead, the note requires the court to examine the totality of the surrounding circumstances, including the specific circumstances of possession and actual use, rather than relying on a single factor. The court concluded that:

> the rule of lenity requires consideration of the guideline in situations in which the defendant is not the sports enthusiast or collector but his possession is solely associated with or related to lawful sporting or collection purposes (i.e.,

---

[6]The dissenting judge noted that the guideline, by its terms, does not apply solely to possession cases. He further noted that what is now application note 5 clearly contemplates that the reduction to level 6 will be available in some distribution cases. <u>Id.</u> at 255-56 (Stanton, J., dissenting).

6

he or she has not used the firearm in a manner inconsistent with those lawful purposes), such as in transporting or holding the firearm for another's lawful sporting or collection purpose.

Id. at 1174.[7]

Later, in United States v. Collins, 313 F.3d 1251 (10th Cir. 2002), the court, relying on Mojica, held that the fact that the defendant transferred his hunting weapon to another to hold as security for a debt did not automatically disqualify him from receiving the reduction. The court reiterated that sporting purposes must be determined by all of the circumstances; thus, one particular non-sporting use – so long as it was lawful – would not alone render § 2K2.1(b)(2) inapplicable. Id. at 1255.

I noted that although Mojica and Collins were not precisely on point, I found them instructive.[8] In those cases, the Tenth Circuit noted that the Commission has recognized that certain types of firearm possession, even by prohibited persons, do not pose the degree of risk that justifies a substantial prison sentence. As the court stated in Collins, § 2K2.1:

> is clearly intended to punish innocent possession and use of a firearm less severely, and improper use more severely. [Section] 2K2.1(b)(2) should be read broadly to encompass circumstances that are consistent with the provision's intent to provide a lesser punishment for possession of a firearm that is more benign. Even if § 2K2.1(b)(2) were ambiguous . . . , strictly construing any ambiguity in § 2K2.1(b)(2) . . . is grievous because refusing

---

[7]The Eighth Circuit similarly held that a defendant who kept his father's gun collection at his house could obtain the reduction. United States v. Moit, 100 F.3d 605 (8th Cir. 1996). The Moit court rejected the notion that "one who possesses a gun collection owned by another can never receive a section 2K2.1(b)(2) decrease." Id. at 606.

[8]The Seventh Circuit has not addressed the issue. In United States v. Gresso, 24 F.3d 879, 881 (7th Cir. 1994), the court held that the firearm must be possessed solely for sporting purposes. However, the issue in that case was whether possession for self-defense also qualified; the court held that it did not.

7

to consider the guideline as a result of a narrow interpretation results in a significantly higher base level. Thus, any ambiguity cuts in favor of [the defendant].

Id. at 1255-56 (internal citations and quote marks omitted).

Section 2K2.1(b)(2) does not by its terms forbid those convicted under § 922(d)(1) from obtaining the reduction; rather, it disqualifies only those to whom sub-sections (a)(1) - (5) apply. Those provisions did not apply to defendant in the present case. Thus, defendant was eligible for the reduction if the § 2K2.1(b)(2) criteria were otherwise met. I found that they were: (1) defendant purchased this shotgun solely for lawful hunting purposes, then transferred it to Scott for the sole purpose of furthering Scott's ability to hunt; and (2) Scott also possessed the gun solely for lawful hunting and did not unlawfully discharge or otherwise unlawfully use the firearm. See Maas, 428 F. Supp. 2d at 890.

Further, I found that granting the reduction in the present case served the purposes of the guideline. As the court noted in Collins, the mere fact of a transfer does not render the provision inapplicable. The defendant and Scott possessed the gun for the sole purpose of hunting, making their possession "more benign" than in the usual case. 313 F.3d at 1255. Therefore, I concluded that the offense level on the firearm count was 6.[9]

---

[9]In addition to relying on Miller, the government noted that the Commission initially assigned different guidelines to firearm possession cases and firearm transfer cases, and included the sporting purposes reduction only in the possession guideline. The Commission later consolidated firearms cases into a single guideline, § 2K2.1. The government argued that despite the consolidation the Commission still intended to limit the reduction to possession cases. However, the "legislative" history of Amendment 374, which effected the consolidation, tells us little. It states only that:

> This Amendment consolidates three firearms guidelines and revises the adjustments and offense levels to more adequately reflect the seriousness of such conduct, including enhancements for defendants previously convicted of felony crimes of violence or controlled substance offenses. In

8

## 2. Enhancement for Obstruction

Defendant also objected to the enhancement for obstruction of justice under U.S.S.G. § 3C1.1. That provision provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

Application note 4 provides examples of obstructive conduct, including perjury at trial and providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the offense. U.S.S.G. § 3C1.1 cmt. n.4. In a case in which the enhancement is based on trial testimony, the court should find all of the elements of perjury, i.e., that the defendant willfully made misrepresentations under oath that were material to the prosecution, and specifically intended to obstruct justice. United States v. Carroll, 412 F.3d 787, 793 (7th Cir. 2005).

---

addition, § 2K1.5 is amended to address offenses committed within a school zone or federal court facility.

United States Sentencing Commission Guideline Manual – Appendix C 239 (1997). The Commission expressed no intent one way or the other as to whether the sporting purposes reduction now applied in disposal cases. Perhaps one could draw the inference that by consolidating the guidelines and refusing to restrict the sporting purposes provision to possession cases, the Commission intended it to apply in all cases covered by § 2K2.1. But see Miller, 224 F.3d at 254 (rejecting this argument). However, rather than relying on non-instructive history, I based my finding on the language of the guideline and its purposes, as discussed in the text. Nevertheless, because the Seventh Circuit had not addressed the issue, I noted that even if I had incorrectly interpreted the guideline, I would under 18 U.S.C. § 3553(a)(1) consider the purposes of § 2K2.1(b)(2) and impose a non-guideline sentence consistent with that provision.

9

The court cannot rely solely on the verdict but rather must make independent findings of fact. United States v. Dunnigan, 507 U.S. 87, 95 (1993). The government bears the burden of proving the applicability of the enhancement by a preponderance of the evidence. United States v. Crowley, 285 F.3d 553, 562 (7th Cir. 2002).

I found that the enhancement applied in the present case. First, defendant perjured himself at trial when he said that he gave the gun to Scott for safekeeping in 2004 after his house burned down. This statement was untrue. Defendant purchased the gun for Scott in October 2002 and gave it to him prior to the March 2003 hunting trip. The statement was willful, and not the result of mistake or mis-recollection. Defendant admitted to Salzer when he actually gave the gun to Scott, and I found Salzer's testimony credible. Defendant also admitted to agents Jagodzinski and DeValkenaere giving the gun to Scott for the hunting trip, though at trial he denied making this statement and testified that the agents were lying in this regard. I found the agents credible. Finally, Scott's statement to law enforcement confirmed when he received the gun from defendant.

Second, defendant perjured himself in denying knowledge of Scott's status as a prohibited person. Defendant testified that he believed Scott's snowmobile theft conviction was a juvenile matter that did not prevent him from having a gun. This was contrary to what he told the agents during the April 27, 2005 interview, when he attempted to excuse his conduct by stating that Scott was "young, drunk and stupid," a statement from which I inferred that defendant was aware of Scott's prohibition but did not consider it a big deal. Further, Scott told law enforcement that defendant purchased the gun for him because he

10

could not buy it himself due to his felony conviction.[10]  Finally, the PSR stated without objection that on October 29, 1996, defendant filed a motion seeking to restore his right to possess firearms following his own juvenile burglary adjudication.  Thus, even if defendant thought that Scott's transgression involved a juvenile court adjudication, he knew of the disability that flowed from such an adjudication, contrary to his trial testimony.

Both statements were material because, if believed, they would have tended to influence or affect the verdict.  See U.S.S.G. § 3C1.1 cmt. n.6.  The only two contested issues in this case were whether defendant disposed of the gun to Scott, and whether defendant knew Scott was a felon.  His perjured testimony went to both issues.  I further found that defendant testified in this fashion with the intent to obstruct justice.  He knew the statements were false and that, if believed, would tend to negate guilt.

Finally, I noted that defendant's false statement to agent Jagodzinski about when he shot the birds represented another example of obstructive conduct.  Because Jagodzinski knew, based on a forensics analysis of the birds, that defendant was lying, defendant's statement did not substantially impede the investigation and thus did not itself justify the enhancement.  See U.S.S.G. § 3C1.1 cmt. n.4(g) & 5(b).  However, the statement represented another lie to get out of trouble, which bolstered the findings I made as described above.

---

[10]Defendant objected to consideration of Scott's statement because Scott did not testify at trial.  He argued that I was limited to considering the trial testimony and my written trial findings.  However, at sentencing the court can consider matters outside the trial record, including reliable hearsay.  See United States v. Roche, 415 F.3d 614, 618 (7th Cir.), cert. denied, 126 S. Ct. 671 (2005); see also 18 U.S.C. § 3661.  Morever, defendant did not contest the truth of Scott's statement, which merely confirmed what I previously found based on the trial testimony.

11

I did not base the enhancement on defendant's testimony at trial that the agents lied about what he said. Nor did I base it on the fact that defendant went to trial and lost, or that he did not give the government advance notice of his defense. Defendant had a right to go to trial and to present whatever defense he wished. However, he had no right to commit perjury. See U.S.S.G. § 3C1.1 cmt. n. 2. I accordingly overruled the objection and imposed the § 3C1.1 enhancement.

### 3. Objection to Denial of § 3E1.1 Reduction

Next, defendant objected to the denial of a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. He noted that he pleaded guilty to the wildlife count and expressed remorse for his conduct in shooting and transporting the birds. However, courts have held that in order to obtain a reduction under § 3E1.1 the defendant ordinarily must accept responsibility for all counts of conviction. See, e.g., United States v. Thomas, 242 F.3d 1028, 1034 (11th Cir. 2001) (collecting cases); see also United States v. Tankersley, 296 F.3d 620 (7th Cir. 2002) (affirming denial of the reduction where the defendant failed to admit all of his involvement in the underlying offense).

In the present case, defendant denied guilt and put the government to its proof at trial on the firearm count, the far more serious charge. See U.S.S.G. § 3E1.1 cmt. n.2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."). Further, I imposed an enhancement for obstruction, which "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Id. cmt. n.4. Finally, defendant's conduct throughout this case demonstrated that he was not committed to "better behavior in the future." United States

12

Case 2:05-cr-00245-LA   Filed 08/05/06   Page 12 of 20   Document 49

v. Lopinski, 240 F.3d 574, 575 (7th Cir. 2001). For example, even after he was indicted, defendant invited Salzer on another hunting trip with Scott, indicating that he had no intention of complying with the law. I observed his demeanor to be defiant during most of the court proceedings. Therefore, I awarded no reduction under § 3E1.1.[11]

### 4. Use of the § 3D1.4 Multi-Count Adjustment

Finally, defendant argued that the two counts of conviction should be grouped under U.S.S.G. § 3D1.2. However, as I explained in Scott's case, grouping is not appropriate when the defendant is convicted of firearm and non-firearm counts. Maas, 428 F. Supp. 2d at 891 (collecting cases). Further, none of the provisions of § 3D1.2 fit the facts of this case.

First, the two counts did not involve the same victim and the same act or transaction, as required by § 3D1.2(a). Where, as here, the "victim" is society, the court looks to the specific societal interest involved. U.S.S.G. § 3D1.2 cmt. n. 2 ("In such cases, the counts are grouped together when the societal interests that are harmed are closely related."). The societal interest served by the statute forbidding transfer of guns to felons is keeping guns out of the hands of those who cannot be trusted with them. The interest served by the wildlife count is protecting and preserving wildlife. These interests are not closely related.

Second, the two counts did not involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common

---

[11]Even if I had awarded a 2 level reduction on the wildlife count, the final offense level would not have changed following application of the § 3D1.4 adjustment.

13

scheme or plan under § 3D1.2(b). As noted, the "victim" was not the same, and there was no evidence of a common scheme or plan.

Third, neither count involved conduct treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to the other under § 3D1.2(c). The base level on both counts was 6, and the only enhancement defendant received was under § 3C1.1.

Finally, § 3D1.2(d) did not apply because the offense level was not based on the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, nor were the offenses ongoing or continuous in nature and the offense guidelines written to cover such behavior. Therefore, I overruled this objection and applied the § 3D1.4 multi-count adjustment to the two counts of conviction.

The offense level on the firearm count was 8 (base level 6 + 2 for obstructing) and the level on the wildlife count 6, producing two units under § 3D1.4 for a final offense level of 10. Coupled with a criminal history category of I, defendant's imprisonment range was 6-12 months.

**B.     Departure**

Defendant moved for a departure from the guideline range based on his family circumstances. Section 5H1.6 provides that family ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside the guideline range. U.S.S.G. § 5H1.6. Thus, this is a disfavored basis for departure, and the court may rely upon it only if the defendant's situation is unusual or extraordinary. See, e.g., United States v. Canoy, 38 F.3d 893, 907 (7th Cir. 1994). The guidelines contain no discount for parents, and it is expected that children will suffer some deprivation when a parent goes

14

to prison. Thus, the defendant must show that the harm to his children will be greater than in the typical case. See United States v. Wright, 218 F.3d 812, 815 (7th Cir. 2000); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999).

In determining whether to depart on this basis, the court should consider three factors. First, it must determine whether, based on the specifics of the defendant's family situation (e.g., the number of dependants, the defendant's role in their lives, and the availability of others to help), the case is unusual. Second, the court must consider whether the guideline range is such that a reasonable departure would spare the defendant's family unnecessary hardship. Third, the court must consider whether a departure is consistent with the purposes of sentencing – the need for just punishment, deterrence, protection of the public and the rehabilitation of the defendant. United States v. Manasrah, 347 F. Supp. 2d 634, 637 (E.D. Wis. 2004); United States v. Norton, 218 F. Supp. 2d 1014, 1019-20 (E.D. Wis. 2002).

In the present case, defendant noted that he had two children and that his wife did not alone earn enough to support the family. He stated that unless he could sell it, the bank would likely foreclose on his house. He further noted that his father recently died, leaving his mother to raise his younger brothers alone. He stated that he could not rely on his in-laws because his wife had become estranged from them. Finally, defendant argued that a departure would not depreciate the seriousness of the offense, and noted that he had no prior criminal record.

I noted that the guidelines authorized a departure based on family circumstance, but I did not believe that the facts of the present case justified such a departure. Defendant's family likely would suffer economically while he served a prison sentence, but that is true

15

of most families in such a situation. See U.S.S.G. § 5H1.6 cmt. n.1(B)(ii) ("[T]he fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration."). Defendant's wife was employed and able to earn a living, and the family had significant net worth on paper. Further, defendant's incarceration would not leave his children without a parent. Finally, I found that under the circumstances of this case a departure would be contrary to the purposes of sentencing. Although defendant and Scott possessed the shotgun for hunting, which mitigated the seriousness of the offense, defendant's conduct nevertheless displayed serious disrespect for the law. Therefore, I denied the motion.

**C.    Imposition of Sentence Under § 3553(a)**

In imposing sentence, the court must consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

16

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

After considering all of the above circumstances, the statute directs the court to impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2).

### 1. Nature of Offenses

Defendant bought a shotgun for his brother, a felon, for a hunting trip. During that trip, they accidentally shot three birds out of season, then intentionally transported them across state lines. The offenses came to light when a game warden saw the birds in a taxidermy shop.

As discussed above, I found that defendant qualified for a reduction to offense level 6 under § 2K2.1(b)(2). However, even if that provision did not technically apply, I would still have imposed a sentence consistent with offense level 6 in order to further the purpose of § 2K2.1(b)(2) – to recognize the mitigated nature of certain types of firearm possession. The transfer and possession of the shotgun in the present case were mitigated because defendant knew Scott intended to use the gun solely for lawful hunting, not to commit crimes or for any other purpose. Thus, the danger often present when a felon is provided a firearm was not present in this case. Courts are free to vary from the guidelines when the sentence produced by a rigid interpretation is contrary to the Commission's intent or is otherwise contrary to the purposes of sentencing § in 3553(a). See United States v. Hadash, 408 F.3d 1080, 1083-84 (8th Cir. 2005) (affirming below guideline sentence

17

where, although § 2K2.1(b)(2) did not technically apply, under the facts of the case the district court reasonably imposed a sentence consistent with that provision).

Nevertheless, although Scott used the shotgun solely for lawful hunting, defendant's offense was nevertheless a serious one. Defendant knew Scott could not have a gun but bought him one anyway. This revealed serious disrespect for the law. Felons cannot have guns, and it was not for defendant to decide that Scott's conviction was no big deal. The situation was aggravated by defendant's lie to agent Jagodzinski about when he shot the birds and by his perjury at trial. Even while this case was pending, defendant invited Salzer to go hunting with him and his brother, which underscored defendant's disrespect for the law.

### 2. Character of Defendant

Defendant was twenty-seven years old, married for seven years, with two children, ages six and five. He had a solid employment record, including five years as a correctional officer for the state Department of Corrections. He resigned that job as a result of his conviction in this case. He planned to begin an ironworker apprenticeship after resolution of the present matter.

Defendant had no adult criminal record but did sustain juvenile adjudications for burglary, criminal damage to property and operating a motor vehicle without owner's consent, as well as adult ordinance violations for writing bad checks and improperly transporting a firearm. Defendant was arrested for drunk driving while the present case was pending, but the charges were later dismissed, and he did not appear to have any substance abuse issues.

18

### 3. Needs of Public and Purposes of Sentencing

I saw no indication that defendant was dangerous or violent, but his conduct suggested that he did not feel bound by the law. Further, while he had no prior adult criminal record, he had violated several ordinances. I concluded that some period of confinement was necessary to promote respect for the law and deter others. The fact that I awarded the reduction under § 2K2.1(b)(2) did not mean that defendant's conduct was excusable. He owed no restitution and appeared to have no correctional treatment needs.

### 4. Consideration of Guidelines

The guidelines called for a term of 6-12 months, and I concluded that a sentence at the low end was sufficient but not greater than necessary to satisfy the purposes of sentencing. This range fell within Zone B of the Grid, allowing substitution of home or community confinement for imprisonment, but I found that a sentence without a period of institutional confinement would not be sufficient. Defendant needed to understand that he is not above the law. I recognized that defendant suffered significant collateral consequences as a result of this case, including loss of his job and perhaps his home. But defendant brought those consequences on himself based on his own conduct and, despite the impact on his family, I concluded that a sentence of imprisonment was nevertheless required under § 3553(a).

Case 2:05-cr-00245-LA   Filed 08/05/06   Page 19 of 20   Document 49

## III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for six months on each count to run concurrently. I further ordered him to serve a two-year term of supervised release, the conditions of which appear in the judgment.

Dated at Milwaukee, Wisconsin, this 5th day of August, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

20

Case 2:05-cr-00245-LA   Filed 08/05/06   Page 20 of 20   Document 49